1

2    **Below is an Order of the Court.**

3

4

5

6

7    *Randall L. Dunn*
    RANDALL L. DUNN
8    U.S. Bankruptcy Judge

9

10    IN THE UNITED STATES BANKRUPTCY COURT

11    DISTRICT OF OREGON

12    In re                                    )
                                             )    Case No. 08-33007-rld11
13    TRINITY CARPET BROKERS, INC., an       )
      Oregon corporation,                    )    ORDER (I) AUTHORIZING AND
14                                            )    APPROVING ASSET PURCHASE
                   Debtor.                   )    AGREEMENT BY AND BETWEEN
15                                            )    SC DESIGN, INC. AND DEBTOR;
                                             )    (II) AUTHORIZING AND
16                                            )    APPROVING SALE OF
                                             )    SUBSTANTIALLY ALL ASSETS OF
17                                            )    DEBTOR FREE AND CLEAR OF
                                             )    INTERESTS; (III) AUTHORIZING
18                                            )    AND APPROVING THE
                                             )    ASSUMPTION AND ASSIGNMENT
19                                            )    OF CERTAIN EXECUTORY
                                             )    CONTRACTS AND UNEXPIRED
20                                            )    LEASES AND (IV) GRANTING
                                             )    CERTAIN RELATED RELIEF
21    _____)

22          THIS MATTER came on for hearing on Motion for Order Approving (A) Sale of

23    Assets  Free and Clear of Liens, Claims and Encumbrances, (B) Assumption and

24    Assignment of Executory Contracts, and (C) Bid Procedures (the "Motion") filed by

25    Trinity Carpet Brokers, Inc. ("Debtor").  Pursuant to that certain Order (A) Approving Bid

26

1    Procedures; (B) Scheduling an Auction and Hearing to Consider Sale of Debtor's

2    Assets; and (C) Establishing Objection Deadlines (the "Procedures Order"), entered

3    July 17, 2008, this Court established Bidding Procedures regarding the sale of certain of

4    Debtor's assets, scheduled the Auction, set a deadline for the filing of objections

5    regarding the Motion, and scheduled the Sale Approval Hearing.  This Court having

6    held a hearing on the Motion on August 13, 2008, having considered the Motion, the

7    Declaration of John Chism in Support of Motion for Order Approving (A) Sale of Assets

8    Free and Clear of Liens, Claims and Encumbrances, (B) Assumption and Assignment of

9    Executory Contracts, and (C) Bid Procedures, and having considered the submissions

10   and arguments of counsel, and the files and records herein, and being now fully advised

11   of the premises,

12       THE COURT FINDS as follows:

13       1.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and

14   1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

15   Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and

16   1409.

17       2.    The statutory predicates for the relief sought in the Motion are sections

18   105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and

19   Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

20       Rules").

21       3.    On or about June 20, 2008, Debtor and SC Design, Inc. ("Purchaser")

22   entered into that certain Asset Purchase Agreement (the "Agreement"), pursuant to

23   which Purchaser agreed to Purchase the assets of Debtor described in paragraph 2 of

24   the Agreement as the "Purchased Assets" (hereafter in the Order referred to as the

25   "Assets") for a purchase price computed by the method as set forth in paragraph 2.6 of

26   Page 2 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

1   the Agreement (subject to adjustment as set forth in the Agreement, the "Purchase

2   Price"), and subject to certain conditions set forth in the Agreement (the "Sale").  A copy

3   of the Agreement is attached hereto as Exhibit A.  Prior to closing, an Amendment to

4   the Asset Purchase Agreement will be entered into by the Debtor and Purchaser to

5   facilitate an orderly closing of the Sale on August 15, 2008, in accordance with the

6   Agreement.

7       4.    The Court entered the Procedures Order on July 17, 2008, and the

8   Procedures Order has become a final and non-appealable order and remains in full

9   force and effect.

10      5.    Due, proper, timely, adequate and sufficient notice of the Motion, the Sale

11  Hearing and the Sale and the transactions contemplated thereby, including without

12  limitation the assumption and assignment of the Executory Contracts to Be Assumed

13  and Assigned By Debtor, has been provided in compliance with the Procedures Order

14  and in compliance with the various applicable requirements of the Bankruptcy Code,

15  Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure.

16  Bankruptcy Code and due process requirements were satisfied by service of: (i) the

17  Motion; (ii) the Notice of Intent to Sell; (iii) that certain Notice of Filing Asset Purchase

18  Agreement by and between Debtor, as Seller, and SC Design, Inc., as Purchaser, filed

19  June 20, 2008; and (iv) that certain Notice of Executory Contracts to Be Assumed and

20  Assigned by Debtor, filed with the Court on August 4, 2008.  Such notice was good,

21  sufficient and appropriate under the circumstances and no other or further notice of the

22  Motion, the Sale Approval Hearing, the sale or the transactions contemplated thereby

23  (including, without limitation, the assumption and assignments of the Assumed

24  Executory Contracts, is or shall be required).

25      6.    A reasonable opportunity to bid, to object and to be heard regarding the

26  Page 3 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND
BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF
SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING
AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1  relief requested in the Motion has been afforded to all creditors, parties in interest and

2  other entities; including, but not limited to: (a) all creditors; (b) all parties who claim

3  interests in or liens upon the Assets; (c) all parties to the Assumed Contracts; (d) all

4  parties who have filed notices of appearance in this case; (e) the Office of the United

5  States Trustee; and (f) the Chairman of the Official Committee of Unsecured Creditors

6  (the "Committee").

7        7.      Debtor may sell the Assets free and clear of all Interests because each

8  entity with a security interest in any Assets to be transferred on the Closing Date (as

9  defined in the Agreement), including the Assumed Executory Contracts has consented

10  to the Sale (including the assumption and assignment of the Assumed Contracts) or is

11  deemed to have consented to the sale.  Those holders of Interests who have been

12  properly noticed and who did not object to the Motion are deemed to have consented

13  pursuant to section 363(f)(2) of the Bankruptcy Code.  None of the Assets are vehicles

14  belonging to the Debtor.

15        8.      Good and sufficient reasons for approval of the Agreement and the Sale

16  have been articulated.  The relief requested in the Motion is in the best interests of

17  Debtor, its estate, its creditors and other parties in interest.

18        9.      Debtor has demonstrated both (a) good, sufficient and sound business

19  purpose and justification and (b) compelling circumstances for the Sale other than in the

20  ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, in that,

21  among other things, the immediate consummation of the Sale to Purchaser is

22  necessary and appropriate to maximize the value of Debtor's estate; the Sale will

23  provide the means for Debtor to maximize distributions to creditors; and absent

24  consummation of the Sale, Debtor would be forced to conduct a piecemeal liquidation of

25  the Assets, which would likely yield substantially less proceeds available to distribute to

26  Page 4 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND
BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF
SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING
AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1    creditors than the Sale.

2        10.    Purchaser is a good faith purchaser under section 363(m) of the

3    Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby with

4    respect to the transactions contemplated by the Agreement.

5        11.    Debtor has authority to execute the Agreement, and all other documents

6    contemplated thereby, and to consummate the transactions contemplated by the

7    Agreement.  The Agreement and all of the transactions contemplated thereby have

8    been duly and validly authorized by all necessary actions of Debtor.  No consents or

9    approvals other than the authorization and approval of this Court are required for Debtor

10    to consummate the Sale.  John Chism, CEO for Debtor, has authority to execute the

11    Agreement and all associated documents necessary to consummate the Sale on behalf

12    of Debtor.

13        12.    The Agreement was negotiated, proposed and entered into by Debtor and

14    Purchaser without collusion, in good faith and from arms'-length bargaining positions.

15    Purchaser is not an "insider" of Debtor, as that term is defined in section 101(31) of the

16    Bankruptcy Code.  Neither Debtor nor Purchaser has engaged in any conduct that

17    would cause or permit the Agreement to be avoided under section 363(n) of the

18    Bankruptcy Code.

19        13.    No other qualified bids for the Assets were received in connection with the

20    Procedures Order and the Sale Hearing.

21        14.    Purchaser has provided Debtor with a deposit having a value of $100,000

22    and has adequately demonstrated its unconditional financial wherewithal to pay the

23    Purchase Price and to consummate the Sale.

24        15.    The consideration to be provided by Purchaser pursuant to the

25    Agreement: (a) is fair and reasonable; (b) is the highest and best offer for the Assets;

26    Page 5 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1  and (c) constitutes reasonably equivalent value and fair consideration under the
2  Bankruptcy Code.

3      16.    The Agreement was not entered into for the purpose of hindering, delaying
4  or defrauding creditors under the Bankruptcy Code.

5      17.    The transfer of the Assets to Purchaser pursuant to the Agreement will be
6  a legal, valid and effective transfer of the Assets, and vests or will vest Purchaser with
7  all right, title and interest of Debtor to the Assets free and clear of Liens (as defined in
8  the Agreement), including any right of setoff, Claims (as defined in the Agreement), and
9  "interests" with the exception of Permitted Liens and Assumed Liabilities (as defined in
10  the Agreement), with all Interests to attach to Debtor's interest in the proceeds of the
11  Sale (the "Sale Proceeds") in order of priority, subject to any rights, claims and
12  defenses of Debtor or objections of other interested parties with respect thereto and
13  subject to the remaining provisions of this Order.

14      18.    Debtor has demonstrated that assuming and assigning the Assumed
15  Executory Contracts in connection with the Sale is an exercise of its sound business
16  judgment, and that such assumption and assignment is in the best interests of Debtor's
17  estate.

18      19.    As of the Closing Date, subject only to the payment of the Cure Amounts,
19  as determined in accordance with the procedures identified in the Motion, each
20  Assumed Executory Contract will be in full force and effect and enforceable against the
21  non-Debtor party thereto in accordance with its terms.

22      20.    Debtor has, to the extent necessary, satisfied the requirements of sections
23  365(b)(1) and 365(f) of the Bankruptcy Code in connection with the assumption of the
24  Assumed Executory Contracts and shall upon assignment thereof on the Closing Date,
25  be relieved from any liability for any breach thereof (other than the liability to pay Cure

26
Page 6 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

1   Amounts that are not Assumed Liabilities on or before the Closing Date or following the

2   Closing Date, as applicable).

3        NOW THEREFORE, IT IS HEREBY ORDERED as follows:

4        21.    The Motion is GRANTED.  All relief granted by the Procedures Order is

5   hereby incorporated by reference to this Order and remains in full force and effect.

6        22.    Any objections to the entry of this Order or the relief granted herein and

7   requested in the Motion that have not been withdrawn, waived or settled, and all

8   reservations of rights included therein, hereby are denied and overruled on the merits

9   with prejudice.

10       23.    The terms and conditions of the Agreement are hereby approved in all

11  respects pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy

12  Code, Debtor is hereby authorized and directed to sell the Assets described in the

13  Agreement to Purchaser and to assume and assign the Assumed Contracts to

14  Purchaser, free and clear of all Interests, except the Permitted Liens and Assumed

15  Liabilities.

16       24.    Pursuant to sections 363(b) and (f) of the Bankruptcy Code, Debtor is

17  authorized to execute and deliver, and empowered to fully perform under, consummate

18  and implement, the Agreement, together with all additional instruments and documents

19  that may be reasonably necessary or desirable to implement the Agreement, and to

20  take all further action as may be requested by Purchaser for the purpose of assigning,

21  transferring, granting, conveying and conferring to Purchaser, or reducing to

22  Purchaser's possession, any or all of the Assets, or as otherwise may be necessary or

23  appropriate to the performance of the obligations as contemplated by the Agreement.

24       25.    Except as expressly permitted or otherwise specifically provided for in the

25  Agreement or this Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy

26  Page 7 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

1    Code, the Assets shall be transferred to Purchaser and, as of the Closing Date, shall be

2    free and clear of all Interests, with the exception of the Permitted Liens and Assumed

3    Liabilities.  All such non-assumed Interests shall attach to the Sale Proceeds to the

4    same extent, validity and priority they attached to the Assets, subject to any rights,

5    claims and defenses Debtor may possess with respect thereto.  All property taxes owed

6    by Debtor shall be apportioned in conformity with paragraph 8.3 of the Agreement.

7        26.    As to all persons and entities who received actual notice of the Motion or

8    the Sale,  Purchaser shall have no liability or responsibility for any liability or other

9    obligation of Debtor arising under or related to the Assets other than as expressly set

10    forth in the Agreement.

11        27.    As to all persons and entities who received actual notice of the Motion or

12    the Sale, Purchaser shall not be deemed, as a result of any action taken in connection

13    with the Agreement, to: (a) be the successor of Debtor; (b) have, de facto or otherwise,

14    merged with or into Debtor; (c) be a mere continuation or substantial continuation of

15    Debtor or the enterprise of Debtor; or (d) be responsible for any liability of Debtor except

16    as expressly set forth in the Agreement.

17        28.    As to all persons and entities who received actual notice of the Motion or

18    the Sale, except as expressly set forth in the Agreement, neither Purchaser nor its

19    affiliates, successors or assigns is acquiring or assuming any liability, warranty or other

20    obligation of Debtor, including, without limitation, any tax incurred but unpaid by Debtor

21    prior to the Closing Date, including, but not limited to, any tax, any fine or penalty

22    relating to a tax, or any addition to tax, whether or not previously assessed, fixed or

23    audited, whether or not paid, and whether or not contested before and adjudicated by a

24    judicial or administrative tribunal of competent jurisdiction.

25        29.    The transfer of the Assets to Purchaser pursuant to the Agreement

26    Page 8 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND
BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF
SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING
AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1  constitutes a legal, valid and effective transfer of the Assets, and shall vest Purchaser

2  with all right, title and interest of Debtor in and to the Assets free and clear of all

3  Interests (other than Permitted Liens and Assumed Liabilities) of any kind or nature

4  whatsoever.

5  30.    On the Closing Date (as defined in the Agreement), this Order shall be

6  construed and shall constitute for any and all purposes a full and complete general

7  assignment, conveyance and transfer of the Assets or a bill of sale transferring good

8  and marketable title in the Assets to Purchaser. Each and every federal, state and local

9  governmental agency or department is hereby directed to accept any and all documents

10  and instruments necessary and appropriate to consummate the transactions

11  contemplated by the Agreement.

12  31.    This Order is and shall be effective as a determination that, all Liens (other

13  than Permitted Liens) shall be, and are, without further action by any person or entity,

14  released with respect to the Assets as of the Closing Date.

15  32.    All filing agents, filing officers, title agents, title companies, recorders of

16  mortgages, recorders of deeds, registrars of deeds, administrative agencies,

17  governmental departments, secretaries of state, federal, state and local officials, and all

18  other persons and entities who may be required by operation of law, the duties of their

19  office or contract, to accept, file, register or otherwise record or release any documents

20  or instruments, or who may be required to report or insure any title or state of title in or

21  to any of the Assets shall be authorized to so request, record, or release such

22  documents or instruments in reliance on this order.

23  33.    John Chism, CEO of Debtor, is hereby authorized, in accordance with

24  sections 105(a), 363 and 365 of the Bankruptcy Code, to cause the Debtor to execute

25  and deliver to Purchaser such documents or other instruments as may be necessary to

26

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

1     consummate the transactions required under the Agreement.

2        34.    The requirements of sections 365(b)(1) and 365(b)(2) of the Bankruptcy

3     Code are hereby deemed satisfied with respect to the Assumed Contracts (subject to

4     the Cure Cost procedures set forth herein).

5        35.    The Assumed Contracts shall be transferred to, and remain in full force

6     and effect for the benefit of, Purchaser, in accordance with their respective terms,

7     notwithstanding any provision in any such Assumed Contract (including provisions of

8     the type described in sections 365(b)(2), (e)(1) and (f)(1) of the Bankruptcy Code),

9     which prohibits, restricts or conditions such assignment or transfer. The non-Debtor

10     party to each Assumed Contract shall be deemed to have consented to such

11     assignment under section 365(c)(l)(B) of the Bankruptcy Code, and Purchaser shall

12     enjoy all of the rights and benefits under each such Assumed Contract as of the

13     applicable Closing Date without the necessity of obtaining such non-Debtor party's

14     written consent to the assumption and assignment thereof.

15        36.    Subject to the terms hereof with respect to the Cure Amounts, all defaults

16     or other obligations of Debtor under the Assumed Contracts arising or accruing prior to

17     the Closing Date will be cured as of the Closing Date in accordance with the terms of

18     the Agreement such that Purchaser shall have no liability or obligation with respect to

19     any default or obligation arising or accruing under any Assumed Contract or prior to the

20     Closing Date, except to the extent expressly provided in the Agreement. Each non-

21     Debtor party to an Assumed Contract is forever barred, estopped and permanently

22     enjoined from asserting against Purchaser or its property or affiliates, or any thereof,

23     any breach or default under any Assumed Contract, any claim of lack of consent

24     relating to the assignment thereof, or any counterclaim, defense, setoff, right of

25     recoupment or any other matter arising prior to the Closing Date for such Assumed

26 Page 10 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1    Contract or with regard to the assumption and assignment thereof pursuant to the

2    Agreement or this Order.

3        37.    Upon assignment of the Assumed Contracts to Purchaser on the Closing

4    Date and payment of Cure Amounts, if any, no default shall exist under any Assumed

5    Contract and no non-Debtor party to any Assumed Contract shall be permitted to

6    declare a default by Purchaser under such Assumed Contract or otherwise take action

7    against Purchaser as a result of Debtor's financial condition, bankruptcy or failure to pay

8    any amounts necessary to cure Debtor's defaults thereunder. Upon entry of this Order

9    and assumption and assignment of the Assumed Contracts, Purchaser shall be deemed

10   in compliance with all terms and provisions of the Assumed Contracts.

11       38.    Notwithstanding anything to the contrary in this Order, upon assignment of

12   the Assumed Executory Contracts, Purchaser is assuming all liabilities arising under the

13   Assumed Executory Contracts arising and accruing on and after the Closing Date.

14       39.    The consideration provided by Purchaser for the Assets under the

15   Agreement is fair and reasonable and may not be avoided under section 363(n) of the

16   Bankruptcy Code.

17       40.    The transactions contemplated by the Agreement are undertaken by

18   Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code

19   and, accordingly, the reversal or modification on appeal of the authorization provided

20   herein to consummate the Sale shall not affect the validity of the Sale to Purchaser.

21   Purchaser is a good-faith purchaser of the Assets, and is entitled to all of the benefits

22   and protections afforded by section 363(m) of the Bankruptcy Code.

23       41.    This Court retains jurisdiction to enforce and implement the terms and

24   provisions of the Agreement, all amendments thereto, any waivers and consents

25   thereunder and of each of the agreements executed in connection therewith in all

26   Page 11 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND
BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF
SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING
AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1    respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the

2    Assets to Purchaser, (b) resolve any disputes arising under or related to the Agreement

3    and (c) interpret, implement and enforce the provisions of this Order.

4        42.    Each of Debtor's creditors is authorized to execute such documents and

5    take all other actions as may be necessary to release its Interests in the Assets, if any,

6    as such Interests may have been recorded or otherwise exist.

7        43.    The terms and provisions of the Agreement and this Order shall be

8    binding in all respects upon, and shall inure to the benefit of, Debtor, its estate,

9    Purchaser and its respective affiliates, successors and assigns, and any affected third

10    parties, notwithstanding any subsequent appointment of any trustee(s) under any

11    chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions

12    likewise shall be binding.

13        44.    After the Closing Date, no person or entity, including, without limitation,

14    any federal, state or local taxing authority, may (a) attach or perfect a lien or security

15    interest against any of the Assets on account of, or (b) collect or attempt to collect from

16    Purchaser or any of its affiliates, any tax (or other amount alleged to be owing by

17    Debtor) (i) for any period commencing before and concluding prior to or after the

18    Closing Date or (ii) assessed prior to and payable after the Closing Date, except as

19    otherwise specifically provided in the Agreement.

20        45.    No bulk sales law or any similar law of any state or other jurisdiction shall

21    apply in any way to the transfer of the Assets to Purchaser.

22        46.    The Agreement and any related agreements, documents or other

23    instruments may be modified, amended or supplemented by the parties thereto, in a

24    writing signed by such parties, and in accordance with the terms thereof, without further

25    order of the Court, provided that any such modification, amendment or supplement does

26
ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

1    not have a material adverse effect on Debtor's estate.

2        47.    The provisions of the Agreement and this Order shall remain effective and

3    enforceable notwithstanding the subsequent entry of any order confirming any Chapter

4    11 plan or other order in this case (including any order entered after any conversion of

5    this cases under Chapter 7 of the Bankruptcy Code).

6        48.    The failure specifically to include any particular provisions of the

7    Agreement in this Order shall not diminish or impair the effectiveness of such

8    provisions, it being the intent of the Court that the Agreement be authorized and

9    approved in its entirety. Likewise, all of the provisions of this Order are nonseverable

10   and mutually dependent. In the event of any direct conflict between the terms of the

11   Agreement and this Order, this Order shall be controlling.

12       49.    This Order shall be effective and enforceable immediately upon entry and,

13   notwithstanding the provisions of Bankruptcy Rules 6004 and 6006, this Order shall not

14   be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable

15   immediately upon issuance hereof. Time is of the essence in closing the transactions

16   referenced herein and Debtor and Purchaser intends to close the Sale as soon as

17   practicable. Therefore, any party objecting to this Order must exercise due diligence in

18   filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

19       50.    The Debtor is authorized to distribute to Sterling Savings Bank (the

20   "Bank"), from time to time on account of its secured claim, all of the Sale Proceeds

21   other than such amount as is reasonably necessary to enable it to pay when due

22   Chapter 11 administrative expenses of the estate (both accrued and budgeted),

23   together with a reasonable reserve not to exceed $100,000.  In addition, the Debtor is

24   authorized to pay from the Sale Proceeds otherwise payable to the Bank the amount of

25   $168,000 to Mohawk Carpet Corporation ("Mohawk") and the amount of $182,000 to

26   Page 13 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

1    Shaw Industries, Inc. ("Shaw").  Such payments to Mohawk and Shaw shall be made on

2    account of their respective secured claims and pursuant to the Bank's agreement to

3    subordinate to that extent its security interest in the Assets to the security interests of

4    such creditors in the Assets.

5

6                                    ###

7

8    PRESENTED BY:

9    By  /s/ Barry P. Caplan
     Barry P. Caplan, OSB No. 65017
10   Martin P. Meyers, OSB No. 99082
     SUSSMAN SHANK LLP
11   1000 SW Broadway, Suite 1400
     Portland, OR  97205-3089
12   Telephone: (503) 227-1111
     Facsimile: (503) 248-0130
13   barry@sussmanshank.com
14   martin@sussmanshank.com

15   Attorneys for Debtor and Debtor-in-Possession

16   cc:    Attached List

17

18   F:\CLIENTS\19838\002\P-ORDER AUTHORIZING SALE FREE AND CLEAR - SC DESIGNV3.DOC

19

20

21

22

23

24

25

26   Page 14 of 14 – ORDER (I) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND
     BETWEEN SC DESIGN, INC. AND DEBTOR; (II) AUTHORIZING AND APPROVING SALE OF
     SUBSTANTIALLY ALL ASSETS OF DEBTOR FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING
     AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
     AND UNEXPIRED LEASES AND (IV) GRANTING CERTAIN RELATED RELIEF

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

TRINITY CARPET BROKERS, INC.,
AS SELLER

AND

SC DESIGN, INC. OR ITS ASSIGNEE
AS PURCHASER

JUNE 20, 2008

# TABLE OF CONTENTS

Page

1.  DEFINITIONS ............................................................................................................. 1
    1.1  Definitions ........................................................................................................ 1
    1.2  Terms Defined Elsewhere in this Agreement ...................................................... 5
    1.3  Other Definitional and Interpretive Matters ....................................................... 6
2.  PURCHASE AND SALE ............................................................................................ 7
    2.1  Purchase and Sale ............................................................................................. 7
    2.2  Excluded Assets ............................................................................................... 8
    2.3  Assumed Liabilities .......................................................................................... 9
    2.4  Excluded Liabilities ........................................................................................ 10
    2.5  Assignment of Contracts and Rights ................................................................ 11
    2.6  Purchase Price; Allocation of Purchase Price ................................................... 12
    2.7  Determination of Purchase Price ..................................................................... 13
    2.8  Non-Refundable Deposit ................................................................................. 13
    2.9  Closing ........................................................................................................... 13
    2.10 Deliveries by Seller ......................................................................................... 13
    2.11 Deliveries by Purchaser ................................................................................... 14
    2.12 Post Closing Date Purchases ........................................................................... 14
    2.13 Disposition of Aged Accounts Receivable ....................................................... 14
3.  REPRESENTATIONS AND WARRANTIES OF SELLER ........................................ 14
    3.1  Organization ................................................................................................... 14
    3.2  Governmental Authorization ........................................................................... 14
    3.3  Noncontravention ........................................................................................... 14
    3.4  Required Consents .......................................................................................... 15
    3.5  Litigation ........................................................................................................ 15
    3.6  Permits; Compliance with Laws and Court Orders ............................................ 15
    3.7  Sufficiency of and Title to the Purchased Assets .............................................. 15
    3.8  Environmental ................................................................................................. 16
    3.9  "AS IS" TRANSACTION ................................................................................ 16
    3.10 Contracts ........................................................................................................ 17
    3.11 Subsidiaries .................................................................................................... 17

**TABLE OF CONTENTS**
(continued)

| | | | |
|---|---|---|---|
| | 3.12 | Employee Benefits | 17 |
| 4. | | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 19 |
| | 4.1 | Organization | 19 |
| | 4.2 | Authorization | 19 |
| | 4.3 | Governmental Authorization | 19 |
| | 4.4 | Noncontravention | 19 |
| | 4.5 | Litigation | 19 |
| | 4.6 | Inspections; No Other Representations | 19 |
| 5. | | COVENANTS OF SELLER | 20 |
| | 5.1 | Conduct of the Business | 20 |
| | 5.2 | Access to Information | 21 |
| | 5.3 | Negotiations with Others | 21 |
| | 5.4 | Notices of Certain Events | 21 |
| | 5.5 | Certain Restrictive Covenants | 21 |
| 6. | | COVENANTS OF PURCHASER | 22 |
| | 6.1 | Access | 22 |
| | 6.2 | Insurance | 22 |
| 7. | | COVENANTS OF PURCHASER AND SELLER | 22 |
| | 7.1 | Efforts; Further Assurances | 22 |
| | 7.2 | Certain Filings | 22 |
| | 7.3 | Public Announcements | 23 |
| | 7.4 | Bankruptcy Issues | 23 |
| 8. | | TAX MATTERS | 27 |
| | 8.1 | Tax Cooperation | 27 |
| | 8.2 | Allocation of Taxes | 27 |
| | 8.3 | Property Taxes | 27 |
| 9. | | EMPLOYEE MATTERS | 28 |
| | 9.1 | Employees and Offers of Employment | 28 |
| | 9.2 | Employee Plans | 28 |
| 10. | | CLOSING CONDITIONS | 28 |

# TABLE OF CONTENTS
## (continued)

|  | 10.1 | Conditions to Obligations of Purchaser and Seller | 28 |
|  | 10.2 | Conditions to Obligations of Purchaser | 29 |
|  | 10.3 | Conditions to Obligations of Seller | 30 |
| 11. | | SURVIVAL | 30 |
| 12. | | TERMINATION | 30 |
|  | 12.1 | Grounds for Termination | 30 |
|  | 12.2 | Effect of Termination | 31 |
|  | 12.3 | Expenses | 31 |
| 13. | | MISCELLANEOUS | 31 |
|  | 13.1 | Notices | 31 |
|  | 13.2 | Waivers | 32 |
|  | 13.3 | Successors and Assigns | 33 |
|  | 13.4 | Governing Law | 33 |
|  | 13.5 | Jurisdiction | 33 |
|  | 13.6 | Waiver of Jury Trial | 34 |
|  | 13.7 | Third Party Beneficiaries | 34 |
|  | 13.8 | Time is of the Essence | 34 |
|  | 13.9 | Severability | 34 |
|  | 13.10 | Entire Agreement; Amendments; Counterparts | 34 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of June 20, 2008 (this "Agreement") is entered into by and between **SC DESIGN INC.**, or its assignee ("Purchaser"), and **TRINITY CARPET BROKERS, INC.**, an Oregon corporation ("Seller"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

### RECITALS:

**WHEREAS,** Seller is engaged in the business of selling and installing flooring materials through retail locations and to contractors and developers (the "Business");

**WHEREAS,** Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and assume such Purchased Assets and Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS,** on June 20, 2008 (the "Petition Date") Seller filed and commenced a Chapter 11 bankruptcy case (the "Bankruptcy Case") captioned *In re Trinity Carpet Brokers, Inc.* (Case No. 08-3307 ), pending in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court");

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under sections 363 and 365 and other applicable provisions of the Bankruptcy Code (as defined below), and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    **Definitions**.

     1.1    Definitions.  Except as otherwise defined herein, the following terms, as used herein, have the following meanings:

        (a)    "Accounts Receivable" means, with respect to Seller, all accounts receivable and rights to payment of Seller other than the Renaissance Homes Receivable, which, as of the Closing Date, are less 120 days after the invoice date, and the full benefit of all security for such accounts or debts, including without limitation any statutory lien rights or other security interests, consisting of all accounts receivable in respect of goods shipped or products sold or services rendered to customers and all rights under related purchase orders and invoices relating to the Business, without regard to any reserve for doubtful accounts or otherwise.

(b)     "Aged Accounts Receivable" means, with respect to Seller, all accounts receivable and rights to payment of Seller other than the Renaissance Homes Receivable, which, as of the Closing Date, are in excess of 120 days after the invoice date, and the full benefit of all security for such accounts or debts, including without limitation any statutory lien rights or other security interests, consisting of all accounts receivable in respect of goods shipped or products sold or services rendered to customers and all rights under related purchase orders and invoices relating to the Business, without regard to any reserve for doubtful accounts or otherwise.

(c)     "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

(d)     "Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time.

(e)     "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Portland, Oregon are authorized or required by law to close.

(f)     "Cash Collateral Order" means, collectively the interim and final orders entered by the Bankruptcy Court authorizing Seller to use cash collateral.

(g)     "Claim" means a "claim" as defined in section 101 of the Bankruptcy Code.

(h)     "Closing Date" means the date of the Closing.

(i)     "COBRA" means the health care continuation provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the regulations, rulings and other pronouncements issued thereunder.

(j)     "Code" means the Internal Revenue Code of 1986, as amended, and the regulations, rulings and other pronouncements issued by the IRS pursuant to the Internal Revenue Code.

(k)     "Confidentiality Agreement" means the Confidentiality Agreement between Seller and Purchaser.

(l)     "Construction Liabilities" means any and all liabilities of Seller arising out of or relating to any claim, cause of action or assertion of any construction defect or related to any construction defect litigation.

(m)     "Contaminant" means any pollutant, hazardous substance, radioactive substance, toxic substance, hazardous waste, medical waste, radioactive waste, special waste, petroleum or petroleum-derived substance or waste, asbestos, PCBs, mold, or any hazardous or toxic constituent thereof and includes, but is not limited to, any

substance defined in or regulated under Environmental, Health or Safety Requirements of Law.

(n)    "<u>Contract</u>" means any contract, indenture, note, bond, lease or other agreement.

(o)    "<u>Cure Amounts</u>" means those amounts payable for Assumed Contracts assumed by Seller pursuant to the Bankruptcy Code.

(p)    "<u>Employee Benefit Plan</u>" means any employee benefit plan, program, policy, practice, contract, agreement, fund or other arrangement (including any "employee benefit plan," as defined in section 3(3) of ERISA) or any employment, consulting or personal services contract, whether written or oral or funded or unfunded, (i) sponsored, maintained or contributed to by Seller or to which Seller is a party, (ii) covering or benefiting any current or former officer, employee, agent, director or independent contractor of Seller (or any dependent or beneficiary of any such individual), or (iii) with respect to which Seller has (or could have) any obligation or liability.

(q)    "<u>Employees</u>" means those individuals who are employed by Seller in connection with the Business as of the Closing Date.

(r)    "<u>Environmental, Health or Safety Requirements of Law</u>" means all foreign, federal, state and local laws, statutes, codes, ordinances, rules, regulations, EHS Permits, or orders relating to or addressing the environment, health or safety in effect at the time of the action or inaction at issue or such laws, statutes, codes, ordinances, rules regulations, EHS Permits, or order of retroactive application, including, but not limited to, any law, statute, code, ordinance, rule, regulation, EHS Permit or order relating to (i) the use, handling, release or disposal of any Contaminant or (ii) workplace or worker safety and health, as such requirements are promulgated by the specifically authorized Governmental Authority responsible for administering such requirements.

(s)    "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations, rulings and other pronouncements issued thereunder.

(t)    "<u>Governmental Authority</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

(u)    "<u>Independent Accounting Firm</u>" means an accounting firm mutually acceptable to the Parties.

(v)    "<u>Intellectual Property Right</u>" means any trademark, service mark, trade name including, without limitation, the name Trinity Carpet & Flooring, mask work, invention, patent, trade secret, copyright, know-how (including any registrations or applications for registration of any of the foregoing), license agreement or any other similar type of proprietary intellectual property right as set forth on <u>Schedule 1.1(t)</u>.

(w)    "Inventory" means, with respect to Seller, all cut and delivered inventory and all builder, commercial and retail inventory owned by Seller and assigned to jobs and scheduled to be installed within 30 days of the Closing Date.

(x)    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by Seller after reasonable inquiry and due diligence under the circumstances.

(y)    "Law" means any federal, state, local, municipal or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

(z)    "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code, including any encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust agreement, right of setoff, recoupment or warranty, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset.

(aa)    "Material Adverse Effect" means a material adverse change in or effect on the Business, the Purchased Assets or financial condition of the Business, taken as a whole, excluding any such change or effect to the extent resulting from or arising in connection with (i) the Transactions or the public announcement thereof, (ii) changes or conditions affecting the industries generally in which Seller operates, or (iii) changes in economic, regulatory or political conditions generally.

(bb)    "Mohawk Note" means that certain note, and all associated contemporaneous and subsequent documents, entered into by Debtor and Mohawk.

(cc)    "Mohawk Secured Claim" means the secured claim asserted by Mohawk Industries, Inc.

(dd)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

(ee)    "Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

(ff)    "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(gg)    "Property Taxes" means all personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for any Tax period.

(hh)    "Retained Employees" means those employees of Seller that are retained and employed by Purchaser from and after the Closing Date.

(ii)    "Renaissance Homes Receivable" means all accounts receivable and rights to payment of Seller from Renaissance Homes.

(jj)    "Secured Lender" means Sterling Savings Bank.

(kk)    "Seller Personnel" shall mean Seller's current or former officers, directors, employees, and agents.

(ll)    "Shaw Note" means that certain note, and all associated contemporaneous and subsequent documents, entered into by Debtor and Shaw.

(mm)    "Shaw Secured Claim" means the secured claim asserted by Shaw Industries, Inc.

(nn)    "Sterling" means Sterling Savings Bank.

(oo)    "Sterling Credit Agreement" means that certain credit agreement, and all associated contemporaneous and subsequent documents, entered into by Debtor and Sterling Savings Bank.

(pp)    "Tax" means (i) any and all federal, state, local and foreign taxes, assessments, and any other governmental charges, fees, duties or other like assessment or charges of any kind whatsoever(including withholding on amounts paid to or by any Person and taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes), together with all interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being or ceasing to be a member of an affiliated, consolidated, combined or unitary group for any period (including, without limitation, any liability under Treasury Regulation section 1.15026 or any comparable provision of foreign, state or local law);or (iii) liability for the payment of any amounts of the type described in (i) or (ii) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person or as a result of any obligations under any agreements or arrangements with any other Person with respect to such amounts.

1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Apportioned Obligations | 8.3 |
| Assumed Contracts | 2.1(b) |
| Assumed Liabilities | 2.3 |
| Auction | 7.4(b)(i) |
| Bankruptcy Case | Recitals |
| Bankruptcy Court | Recitals |

| Term | Section |
|------|---------|
| Bid Deadline | 7.4(b)(i) |
| Bidding Procedures | 7.4(b) |
| Bid Procedures Motion | 7.4(a) |
| Bid Procedures Order | 7.4(a) |
| Breakup Fee | 7.4(b)(iii) |
| Business | Recitals |
| Chapter 11 Licenses | 2.1(c) |
| Closing | 2.109 |
| EHS Permits | 3.9 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Allocation | 2.6(b) |
| Final Purchaser | 7.4(b)(ii) |
| Incremental Bid Amount | 7.4(b)(ii) |
| Initial Overbid | 7.4(b)(i) |
| Initial Overbid Amount | 7.4(b)(i) |
| Non-Refundable Deposit | 2.8(a) |
| Overbidder | 7.4(b)(i) |
| Permitted Liens | 3.7 |
| Post-Closing Tax Period | 8.3 |
| Prevailing Bid | 7.4(b)(ii) |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Qualified Bidder | 7.4(b)(ii) |
| RCRA | 3.8(c) |
| Required Consents | 3.4 |
| Required Permits | 3.6 |
| Sale Approval Hearing | 7.4(b)(ii) |
| Sale Approval Order | 7.4(b)(iv) |

1.3    Other Definitional and Interpretive Matters. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)    Dollars. Any reference in this Agreement to money shall mean U.S. dollars.

(c)    Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not

otherwise defined therein shall be defined as set forth in this Agreement. Any Schedule that is referenced herein but is not attached hereto on the date of execution of this Agreement shall be prepared, delivered and attached to this Agreement prior to the Closing.

(d)    <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)    <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)    <u>Herein</u>. The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)    <u>Including</u>. The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## 2.    <u>Purchase and Sale</u>.

2.1    <u>Purchase and Sale</u>. Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to the following assets, properties and rights of Seller relating to the Business (the "<u>Purchased Assets</u>"), free and clear of all Liens and Claims (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by section 363 of the Bankruptcy Code, including the following:

(a)    all Inventory relating to the Business as of the Closing Date, including any inventory purchased as set forth in Section 2.12;

(b)    the executory contracts and unexpired leases of Seller that were executed or entered into on or prior to the Petition Date and that are set forth on <u>Schedule 2.1(b)</u> as such may be amended up until the Closing Date (the "<u>Assumed Contracts</u>");

(c)    all transferable licenses, permits or other governmental authorizations of Seller, including all contractors licenses ("<u>Chapter 11 Licenses</u>"), including those set forth on <u>Schedule 2.1(c)</u>;

(d)    all Accounts Receivables existing as of the Closing Date relating to the Business;

(e)    all Aged Accounts Receivables existing as of the Closing Date relating to the Business, subject to the procedures and limitations set forth in Section 2.13.

(f)    the machinery, equipment, furniture, furnishings, fixtures and other items of tangible personal property, including all office equipment and supplies located, as set forth on Schedule 2.1(e);

(g)    all transferable Intellectual Property Rights;

(h)    those cars, trucks, forklifts, other industrial vehicles and other motor vehicles currently used in the Business, set forth on Schedule 2.1(g);

(i)    all warranty claims assertable against third party manufacturers of machinery, equipment, goods and inventory included within the Purchased Assets;

(j)    all claims arising under any insurance policies for losses caused or occurring to the Purchased Assets between the execution of this Agreement and the Closing Date;

(k)    all books and records of Seller relating solely to the Business or the Purchased Assets (provided that Seller shall be entitled to retain copies of such books, records, files and papers); provided, however, that Purchaser must retain all IRS required records for a period of at least seven years and shall allow Seller, its agents, and the IRS reasonable access to the same;

(l)    all unfilled orders and commitments of Seller executed or entered into in the ordinary course of business after the Petition Date specifically identified on Schedule 2.1(l), but only to the extent that such orders and commitments were executed or entered into according to Seller's customary or historical terms for such customers; and

(m)    all general intangibles, including without limitation, all processes and procedures.

2.2    Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include any assets, properties or rights not specifically identified in Section 2.1, including the following (the "Excluded Assets"):

(a)    the minute books and organizational documents of Seller;

(b)    all of Seller's cash and cash equivalents on hand (including all undeposited checks) in banks or other financial institutions, other than deposits included under Section 2.1(l);

(c)    except as set forth in Section 2.1, all insurance policies relating to the Business and all claims arising under such policies prior to the Closing, and all credits, proceeds, insurance premium refunds, and all causes of action or rights thereunder;

(d)     all rights of Seller arising under this Agreement or in connection with the Transactions;

(e)     any Purchased Asset sold or otherwise disposed of pursuant to Section 5.1(b) prior to the Closing Date;

(f)     all accounts, notes and other receivables and amounts owed to Seller by any one or more of Seller's Affiliates;

(g)     except as provided in Section 2.1(l), all utility deposits, security deposits and other deposits of any kind or nature whatsoever;

(h)     assets held in trust for the benefit of Employees, such as assets held under any Employee Benefit Plan;

(i)     all rights of Seller under any Contracts that are not Assumed Contracts;

(j)     the Renaissance Home Receivable;

(k)     any retail operations conducted by Seller at any location;

(l)     all unfilled orders and commitments of Seller not specifically identified on Schedule 2.1(l); and

(m)     those assets listed in Section 2.1, which Purchaser may designate from time to time prior to Closing to be an Excluded Asset (for which designated assets there shall be no reduction in the Purchase Price).

2.3     Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, from and after the Closing Date, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Seller or the Business (the "Assumed Liabilities"):

(a)     all liabilities and obligations of Seller arising under the Assumed Contracts to the extent that such liabilities arise on or after the Closing Date and the payment of all Cure Amounts under the Assumed Contracts and all obligations in connection with the demonstration of adequate assurance of future performance required under section 365(b)(1)(C) of the Bankruptcy Code;

(b)     all liabilities and obligations of Seller arising under the, Chapter 11 Licenses and Intellectual Property Rights from and after the Closing Date;

(c)     all liabilities arising from the operation of the Business or the ownership of the Purchased Assets by Purchaser from and after the Closing Date and all routine installation warranty obligations owed by Seller to customers for work performed prior to the Closing Date, provided, that Purchaser does not assume any Construction Liabilities;

(d)     all costs, expenses and liabilities pro rated to Purchaser as set forth in this Agreement (including Section 8.3);

(e)     upon pro-ration on a pre and post-Closing basis of any refunds or rebates that are owing under any of the contracts and agreements listed on Schedule 2.3(e) that give rise to an obligation to pay a refund or rebate to Seller's customers, all liabilities relating to any refund or rebate associated with post-Closing business activities of Purchaser (and Seller shall be responsible for the payment of any refund or rebate with respect to pre-Closing business activities of Seller); and

(f)     all liabilities with respect to accrued vacation with respect to Retained Employees.

2.4     Excluded Liabilities. Purchaser shall not assume and shall be deemed not to have assumed, and Seller shall be solely and exclusively liable with respect to, any liabilities of Seller other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, unless otherwise agreed by Purchaser in writing, the Excluded Liabilities include the following:

(a)     all obligations of Seller under the Sterling Credit Agreement, including as the same may be amended or modified by order of the Bankruptcy Court, including any orders authorizing the use of cash collateral;

(b)     all obligations of Seller under the Mohawk Note;

(c)     all obligations of Seller under the Shaw Note;

(d)     except as otherwise provided in Section 2.2(c), any liability of Seller or of any predecessor owner(s) of the Business or the Purchased Assets arising in any manner from a Claim of any kind or nature whatsoever;

(e)     any and all bonuses, severance, earned sick leave and other paid time off of the Employees of the Seller arising at any time before, on or after the Closing Date, except for accrued vacation pay relating to Retained Employees;

(f)     any liabilities of Seller under any Employee Benefit Plan for periods prior to the Closing Date;

(g)     all liabilities relating to or arising out of the ownership or operation of an Excluded Asset;

(h)     liability for any Taxes due or payable by Seller for any Pre-Closing Tax period or arising out of the ownership or operation of the Business or the Purchased Assets on or before the Closing Date;

(i)     all liabilities relating to amounts required to be paid by Seller hereunder;

(j)    any liability of Seller in the nature of product liability, including, without limitation, any liability for claims made for injury to person, damage to property or other damage arising from, caused by or arising out of the installation, sale or the rendering of any service, by Seller prior to the Closing Date;

(k)    any liability of Seller to a third party for infringement of such third party's intellectual property rights;

(l)    other than with respect to Cure Amounts (which Purchaser will pay in connection with the Closing), all liabilities of Seller for any breach or failure to perform any of Seller's covenants and agreements contained in, or made pursuant to, any contract, including the Assumed Contracts, to the extent such breach or failure to perform arises on or prior to the Closing Date;

(m)    liabilities of Seller for any violation of or failure to comply with Laws, or any Order, writ, injunction, judgment, plan or decree of any Governmental Authority;

(n)    any Construction Liabilities;

(o)    any liabilities of Seller relating to or arising out of any employment action or practice in connection with persons employed or seeking to be employed in the Business, including, without limitation, liabilities based upon breach of employment or labor contract, employment discrimination, wrongful termination, wage and hour or health and safety requirements, workers compensation, COBRA, ERISA, or the National Labor Relations Act, constructive termination, wrongful termination, failure to give reasonable notice or pay-in-lieu-of-notice, severance or termination pay;

(p)    liabilities of Seller to its present or former Affiliates;

(q)    any obligation of Seller to indemnify any Person by reason of the fact that such Person was a director, officer, employee, or agent of Seller or was serving at the request of Seller as a partner, trustee, director, officer, employee, professional or agent of another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaw, agreement, or otherwise);

(r)    any of Seller's costs or expenses of administration arising in the Bankruptcy Case, including any costs or expenses entitled to administrative priority; and

(s)    liabilities of Seller under or related to any asset listed in Section 2.2 including any asset which Purchaser designates as an Excluded Asset pursuant to Section 2.2(e).

2.5    Assignment of Contracts and Rights. To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts and Intellectual Property Rights shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to section 365 of the

Bankruptcy Code. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or order of the Bankruptcy Court under section 365 of the Bankruptcy Code, would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder. If such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363 and/or 365 of the Bankruptcy Code, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets. With respect to any Assumed Contract, Seller may, rather than exercising its rights to assume and assign such contract under section 365 of the Bankruptcy Code, subject to applicable law, elect to cure all outstanding obligations under such Contract in a manner sufficient to take title to the underlying property and sell such property to Purchaser hereunder. The purchase price for such property shall be its orderly liquidation value determined pursuant to Section 2.7.

2.6    Purchase Price; Allocation of Purchase Price.

(a)    In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Purchased Assets, at the Closing, Purchaser shall pay to Seller the Purchase Price. The Purchase Price shall be the sum of (i) 85% of the Accounts Receivable measured as of the Closing Date, but not including Accounts Receivable that are outstanding for more than 120 days, plus (ii) the amount equal to Seller's cost for all Inventory; (iii) the orderly liquidation value of all furniture, computers and equipment being purchased by Purchaser, as determined pursuant to Section 2.7(c); plus (iv) the Non-Refundable Deposit. The Purchase Price, minus the Non-Refundable Deposit (defined below) shall be remitted by wire transfer of immediately available federal funds to a bank account (or accounts) as shall be designated in writing no later than one (1) day prior to the Closing Date by Seller to Purchaser.

(b)    Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with section 1060 of the Code and the regulations thereunder. Prior to Closing, Purchaser shall deliver to Seller a tentative allocation of the Purchase Price, applicable Assumed Liabilities and other relevant items. Such tentative allocation shall be set forth on Schedule 2.6 hereof and attached at Closing and shall be reasonably determined by Purchaser and reasonably satisfactory to Seller. Purchaser shall finalize the tentative allocation set forth on Schedule 2.6 and deliver such final Schedule 2.6 (the "Final Allocation") to Seller within ten (10) Business Days following the date that all adjustments to Purchase Price become final and binding pursuant to Section 2.7. Seller agrees to promptly provide Purchaser with any information required to complete Schedule 2.6. The Final Allocation shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and the determination of basis for income Tax purposes, and each of the parties hereto agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth the Final Allocation with its federal and applicable state income Tax returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations

that have been promulgated pursuant to section 1060 of the Code and similar applicable state laws and regulations.

2.7    Determination of Purchase Price.

(a)    A physical inventory will be taken by Seller with the participation of Purchaser, and any advisor desired by Purchaser, immediately prior to Closing to determine the Inventory of the Business as of the Closing.

(b)    Seller shall provide Purchaser with a certificate as of the Closing Date setting forth the Accounts Receivable as of that date (the "Closing Accounts Receivable Certificate").

(c)    The orderly liquidation value of the personal property considered for purchase by Purchaser hereunder (not including Inventory and Accounts Receivable), shall be determined by a third party liquidator to be retained by the parties for this purpose. Seller shall pay all costs of the third party liquidator.

2.8    Non-Refundable Deposit.

(a)    On the later of one (1) Business Day after (i) execution of this Agreement by the Parties or (ii) the Petition Date, Purchaser shall wire transfer by immediately available funds to a third-party escrow account specified by Seller (and subject to an escrow agreement substantially in the form attached hereto as Exhibit A) the amount of $100,000 (the "Non-Refundable Deposit") payable to the order of Seller, to be used by Seller to pay administrative expenses incurred in the Bankruptcy Case, including without limitation, the payment of employee wages, the payment of fees owed to the Office of the United States Trustee and professional fees owed to counsel for Seller or any counsel retained by any Committee. No portion of the Non-Refundable Deposit shall be used to pay fees or other amounts due and owing to Sterling.

2.9    Closing.    The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Sussman Shank LLP, 1000 Broadway, Suite 1400, Portland, OR 97205, no later than three (3) Business Days after satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree.

2.10    Deliveries by Seller.    At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)    a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement"), duly executed by Seller; and

(b)    a bring-down certificate as required under Section 10.2(c).

2.11    Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)    to Seller, the Purchase Price, less the Non-Refundable Deposit; and

(b)    to Seller, the Assignment and Assumption Agreement, duly executed by Purchaser.

2.12    Post Closing Date Purchases. For a period of 120 days after the Closing Date, Purchaser shall possess a first right of refusal to purchase any inventory of Seller not included within the definition of Purchased Assets, without the necessity of further Bankruptcy Court approval. Purchaser may exercise this right of first refusal by (i) identifying to Seller in writing such eligible inventory and (ii) paying to Seller Cash in an amount equal to 90% of Seller's landed invoice cost for such inventory. Such purchases are defined as "Post Closing Date Purchases." Seller shall place the proceeds of Post Closing Date Purchases ("Post Closing Date Purchases Proceeds") in a segregated account pending further order of the Bankruptcy Court regarding relative priorities. Nothing contained in this Section 2.12 shall create or impose any obligation on Purchaser to purchase any inventory from Seller after the Closing Date.

2.13    Disposition of Aged Accounts Receivable. To the extent that Purchaser collects any Aged Accounts Receivable, the Purchaser shall be entitled to retain 15 percent of the amount received after deducting the costs of collection. Purchaser shall remit to the remainder to Seller. Any payment received in respect of an Aged Accounts Receivable shall be allocated pursuant to the instructions of the payor. In the event that the payor provides no instructions, amounts collected shall be allocated to the oldest Aged Accounts Receivable invoice of payor. On the ninetieth day after the Closing Date, any uncollected Aged Accounts Receivable shall revert, without further order of the Bankruptcy Court, to Seller.

**3.**    Representations and Warranties of Seller.

Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date hereof as follows:

3.1    Organization. Seller is a corporation validly existing under the laws of the State of Oregon, and subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted.

3.2    Governmental Authorization. Other than approval of the Bankruptcy Court and except as disclosed in Schedule 3.2, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller does not require Seller to make any filing with, or to obtain any permit, authorization, license, consent or approval of, any Governmental Authority, except where the failure to so make or obtain would not have a Material Adverse Effect.

3.3    Noncontravention. Subject to entry by the Bankruptcy Court of the Sale Approval Order in the Bankruptcy Case, the execution, delivery and performance by Seller of

this Agreement and the consummation of the Transactions does not and will not (i) violate Seller's articles or certificate of incorporation, as amended, or bylaws, (ii) assuming compliance with the matters referred to in Section 3.2, violate any Laws or Orders, (iii) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which Seller is entitled under any provision of any agreement or other instrument binding upon Seller except for breaches and defaults referred to in section 365(b)(2) of the Bankruptcy Code, or (iv) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens.

        3.4    Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 3.4 (the "Required Consents"), there is no agreement or other instrument binding upon Seller requiring a consent, approval or action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

        3.5    Litigation. Except as disclosed in Schedule 3.5, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Seller, threatened against or affecting, Seller or the Purchased Assets or any Employee Benefit Plan before any court or arbitrator or any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

        3.6    Permits; Compliance with Laws and Court Orders.

        (a)    Schedule 3.6 sets forth a list of all material permits, governmental licenses, orders, registrations, and other approvals of all federal, state, local and foreign governmental and regulatory bodies obtained by Seller and currently used in connection with the operation of the Business and the Purchased Assets (the "Required Permits"), and the Required Permits are in full force and effect in accordance with their terms. To the Knowledge of Seller, Seller has not received written notice of any additional, existing or continuing violation of any Required Permit or suspension or cancellation of any Required Permit.

        (b)    To the Knowledge of Seller, Seller is not in violation of any law, rule, regulation, judgment, injunction, order or decree applicable to the Purchased Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect.

        3.7    Sufficiency of and Title to the Purchased Assets. Seller owns the Purchased Assets and subject to the entry of the Sale Approval Order, upon consummation of the Transactions, Purchaser will be vested with good and marketable title to such Purchased Assets, free and clear of all Liens to the fullest extent permissible under section 363 of the Bankruptcy Code, other than Assumed Liabilities and Liens for Taxes, assessments and similar charges that are not yet due or are being contested in good faith (the "Permitted Liens").

3.8    <u>Environmental</u>. Except as disclosed on <u>Schedule 3.8</u>:

(a)    Seller is in compliance in all material respects with all Environmental, Health or Safety Requirements of Law applicable to the Real Property and all activities, products and conduct of business related thereto, including, without limitation, the treatment, remediation, removal, transport, storage, release (defined below) and/or disposal of any Contaminant;

(b)    Seller has obtained, as required by Environmental, Health or Safety Requirements of Law, all environmental, health and safety permits, consents, licenses and other authorizations (collectively, "<u>EHS Permits</u>") necessary for the operation of the Real Property, all such EHS Permits are in good standing, and Seller is currently in compliance in all material respects with all terms and conditions of such EHS Permits. No material change in the facts or circumstances reported or assumed in the applications for or the granting of such EHS Permits exists. To Seller's Knowledge, there are no proceedings threatened which would jeopardize the validity of any such EHS Permits; and

(c)    Seller has not disposed (as such term is defined in the Federal Resource Conservation and Recovery Act ("<u>RCRA</u>")) of any hazardous waste (as such term is defined in RCRA) at any of the Real Property in a manner that is not in material compliance with the applicable Environmental, Health and Safety Requirements of Law, nor has Seller caused, contributed to, or exacerbated the release (as such term is defined at 42 U.S.C. §9601(22), not including exclusions therein) of any contaminant at the Real Property into the environment, including groundwater.

3.9    "<u>AS    IS</u>"    TRANSACTION.    PURCHASER    HEREBY ACKNOWLEDGES    AND    AGREES    THAT,    NOTWITHSTANDING    THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS <u>SECTION 3</u>, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING    DATE,    AND    FOLLOWING    CLOSING    SELLER    MAKES    NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR THE BUSINESS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS OR THE BUSINESS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR THE BUSINESS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS OR THE BUSINESS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS OR THE BUSINESS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER

PORTION OF THE PURCHASED ASSETS OR THE BUSINESS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR THE BUSINESS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS OR THE BUSINESS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND THE BUSINESS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AND THE BUSINESS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS AND THE BUSINESS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AND THE BUSINESS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

3.10    Contracts.    Except as set forth on Schedule 3.10, (i) the Assumed Contracts are in full force and effect and are legally binding and enforceable by and against the parties thereto, subject to the possibility that enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws now or hereafter in effect relating to creditors' rights, or principles of equity, (ii) the Seller is not in violation thereof, (iii) to the Knowledge of Seller, no party thereto (other than Seller) is in violation thereof, and (iv) no condition, event or act is existing or has occurred that (with or without the lapse of time or the giving of notice, or both) would result in a default or right of termination thereunder.

3.11    Subsidiaries.    Seller does not have any subsidiaries and does not directly or indirectly hold equity in any other entities.

3.12    Employee Benefits.

(a)    Schedule 3.12(a) contains a complete and accurate list of all Employee Benefit Plans. Seller does not have any agreement, arrangement, commitment or obligation, whether formal or informal, whether written or unwritten and whether legally binding or not, to create, enter into or contribute to any additional Employee Benefit Plan, or to modify or amend any existing Employee Benefit Plan.

(b)    With respect to each Employee Benefit Plan: (i) such Employee Benefit Plan was properly and legally established; (ii) such Employee Benefit Plan is, and at all times since inception has been, maintained, administered, operated and funded in all material respects in accordance with its terms and in compliance with all applicable requirements of all applicable Laws, including, without limitation, ERISA, COBRA, and the Code; (iii) Seller and all other Persons (including, without limitation, all fiduciaries) have, at all times and in all material respects, properly performed all of their duties and obligations (whether arising by operation of Law, by contract or otherwise) under or with respect to such Employee Benefit Plan, including, without limitation, all reporting, disclosure and notification obligations; and (iv) all

contributions, premiums and other payments due or required to be paid to (or with respect to) such Employee Benefit Plan have been timely paid. There exists no condition or set of circumstances in connection with which Purchaser could incur, directly or indirectly, any liability or expense with respect to any Employee Benefit Plan.

(c)     Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code is, and at all times since inception has been, so qualified and its related trust and/or group annuity contract is, and at all times since inception has been, exempt from taxation under Section 501(a) of the Code. Each such Employee Benefit Plan (i) is the subject of an unrevoked favorable determination letter from the IRS with respect to such Employee Benefit Plan's qualified status under the Code, as amended by that legislation commonly referred to as "GUST" and "EGTRRA" and all subsequent legislation, (ii) has remaining a period of time under the Code or applicable Treasury regulations or IRS pronouncements in which to request, and make any amendments necessary to obtain, such a letter from the IRS, or (iii) is a prototype plan or volume submitter plan entitled, under applicable IRS guidance, to rely on the favorable opinion or advisory letter issued by the IRS to the sponsor of such prototype or volume submitter plan. Nothing has occurred, or is reasonably expected by Seller to occur, that will or could adversely affect the qualification or exemption of any such Employee Benefit Plan or its related trust or group annuity contract. Seller has provided Purchaser with a copy of the most recent determination letter issued by the IRS with respect to each such employee benefit plan.

(d)     There are no actions, suits or claims (other than routine claims for benefits) pending or, to the knowledge of Seller, threatened with respect to (or against the assets of) any Employee Benefit Plan, nor, to the knowledge of Seller, is there a basis for any such action, suit or claim. No Employee Benefit Plan is currently under investigation, audit or review, directly or indirectly, by any Governmental Authority, and, to the knowledge of Seller, no such action is contemplated or under consideration by any Governmental Authority.

(e)     Seller is not, nor has it ever been, a member of (i) a controlled group of corporations, within the meaning of section 414(b) of the Code, (ii) a group of trades or businesses under common control, within the meaning of section 414(c) of the Code, (iii) an affiliated service group, within the meaning of section 414(m) of the Code, or (iv) any other group of Persons treated as a single employer under section 414(o) of the Code.

(f)     Seller does not sponsor, maintain or contribute to, nor has it ever sponsored, maintained or contributed to (or been obligated to sponsor, maintain or contribute to), (i) a "multiemployer plan," as defined in section 3(37) or 4001(a)(3) of ERISA or section 414(f) of the Code, (ii) a multiple employer plan within the meaning of section 4063 or 4064 of ERISA or section 413 of the Code, (iii) an employee benefit plan that is subject to section 302 of ERISA, Title IV of ERISA or section 412 of the Code, or (iv) a "multiple employer welfare arrangement," as defined in section 3(40) of ERISA.

(h)     Schedule 3.12(h) lists all individuals who are (or will be) "M&A qualified beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) for purposes of COBRA with respect to the transactions contemplated by this Agreement.

**4.**     Representations and Warranties of Purchaser.

Purchaser represents and warrants to Seller as follows:

4.1     Organization.  Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws its state of incorporation and has all power and material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

4.2     Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the powers of Purchaser and have been duly authorized by all necessary action on the part of Purchaser.  This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3     Governmental Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser does not require Purchaser to make any filing with, or to obtain any permit, authorization, license, consent or approval of, any Governmental Authority.

4.4     Noncontravention.  Subject to entry by the Bankruptcy Court of the Sale Approval Order in the Bankruptcy Case, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions does not and will not (i) violate Purchaser's articles or certificate of incorporation, as amended, bylaws or any resolution adopted by the board of directors of Purchaser or the shareholders of Purchaser, (ii) violate any Laws or Orders, or (iii) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound.

4.5     Litigation.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any court or arbitrator or any Governmental Authority, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.6     Inspections; No Other Representations.  Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and the Business and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder.  Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Purchaser acknowledges that Seller has given Purchaser complete and open access to the key employees, documents and facilities of the Business. Purchaser acknowledges and agrees that the Purchased Assets and the Business are being sold on an "as is, where is" basis and Purchaser agrees to

accept the Purchased Assets and the Business and the Assumed Liabilities in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement. Without limiting the generality of the foregoing, Purchaser acknowledges that Seller makes no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business or (ii) any other information or documents made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly set forth in this Agreement.

**5.    Covenants of Seller.**

Seller agrees that:

5.1    Conduct of the Business. Except as may be required by the Bankruptcy Court, except for the consequences resulting from the commencement and continuation of the Bankruptcy Case, and except as may be required or contemplated by this Agreement, from the date hereof until the sooner of the Closing Date or the date of termination of this Agreement, Seller shall use its commercially reasonable efforts to conduct the Business in the ordinary course consistent with past practice and to preserve intact the business organizations and relationships with third parties (including suppliers and customers). Without limiting the generality of the foregoing, from the date hereof until the sooner of the Closing Date or the date of termination of this Agreement, except (i) as disclosed on Schedule 5.1, (ii) as may be required by the Bankruptcy Court, (iii) for the consequences resulting from the commencement and continuation of the Bankruptcy Case, or (iv) as may be required or contemplated by this Agreement, Seller will not:

(a)    with respect to the Business acquire a material amount of assets from any other Person;

(b)    sell, lease, mortgage, encumber, license or otherwise dispose of any Purchased Assets except (i) pursuant to existing contracts or commitments disclosed to Purchaser prior to the date of this Agreement, or (ii) in the ordinary course of business consistent with past practice;

(c)    agree or commit to do any of the foregoing;

(d)    materially alter any Assumed Contract;

(e)    incur any obligations other than in the ordinary course of business; or

(f)    take any action that would reasonably be expected to cause the failure of any condition contained in Section 10.2 (other than actions taken by Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Case).

5.2     Access to Information. From the date hereof until the Closing Date, Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of the Business for the purposes of evaluating Purchased Assets and all properties, books, accounts, records and documents of, or relating to, the Purchased Assets, subject to the terms of the Confidentiality Agreement. Seller hereby acknowledges and agrees that such access is critical to Purchaser's ability to meet its obligations under this Agreement and close the Transactions.

5.3     Negotiations with Others. Seller hereby consents to Purchaser entering into confidential discussions and negotiations with any third parties that Purchaser, in its sole and absolute discretion, deems appropriate regarding this Purchase Agreement and the transactions contemplated hereby, including any of Seller's suppliers, creditors, customers, lessors, Employees, management, representatives or other parties; provided, however, that any such discussions or negotiations shall not unreasonably interfere with the operations of the Business. Seller further agrees that Purchaser may exclude representatives of Seller from any of Purchaser's discussions with such third parties, in Purchaser's sole and absolute discretion.

5.4     Notices of Certain Events. Seller shall promptly notify Purchaser of:

(a)     any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)     any material written communication from any Governmental Authority in connection with or relating to the Transactions;

(c)     the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.5; and

(d)     the occurrence or existence of any other matter following the date of this Agreement that would have been required to have been disclosed pursuant to Section 3.

5.5     Certain Restrictive Covenants. In order to induce Purchaser to enter into this Agreement and consummate the Transactions, Seller agrees that following Closing that it shall not, without the prior written consent of Purchaser, for its own account or jointly with another, directly or indirectly, for or on behalf of any Person, as principal, agent, shareholder, participant, partner, manager, sales representative or otherwise use, disclose or reveal to any Person, any Confidential Information (as defined below) of Purchaser; provided, however, that the obligations of this Section 5.5 shall terminate with respect to any business information that does not constitute a trade secret under applicable law upon the expiration of two (2) years after the Closing Date. "Confidential Information" means all information of Purchaser which derives value, economic or otherwise, from not being generally known to the public, but excluding any information that (i) is in the public domain (or becomes available in the public domain) through

no action of Seller, (ii) is disclosed with the prior written consent of Purchaser, or (iii) is required to be disclosed by an order, any law or any governmental entity.

**6.     Covenants of Purchaser.**

Purchaser agrees that:

6.1     Access. On and after the Closing Date and until the Bankruptcy Case is dismissed or closed, or any time during which the Bankruptcy Case is open or reopened, upon reasonable written notice, Purchaser will afford promptly to Seller and its agents reasonable access during normal business hours to its properties, books, records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment or the reconciliation of Claims in the Bankruptcy Case or to permit Seller to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; *provided* that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser. Seller agrees that at Purchaser's request it will enter into a confidentiality agreement in favor of Purchaser in connection with any such access on terms consistent with those of the Confidentiality Agreement.

6.2     Insurance. To the extent that any insurance policies of Seller or any of its Affiliates cover any loss, liability, claim, damage or expense relating to any Purchased Assets and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser shall cooperate with Seller in submitting and pursuing such claims.

**7.**     Covenants of Purchaser and Seller.

Purchaser and Seller agree that:

7.1     Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement; *provided, however*, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case (including soliciting higher or better offers for the Purchased Assets). Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

7.2     Certain Filings. Seller and Purchaser shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings,

furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

7.3     Public Announcements.  Neither Purchaser nor Seller shall make any public announcements or statements concerning the Transactions without the prior consent of all parties hereto except, after consultation with counsel, to the extent required by applicable law or ordered or requested by the Bankruptcy Court.  Upon the date hereof and upon the filing of the Bid Procedures Motion (defined below), Purchaser acknowledges and agrees that Seller may provide copies of this Agreement to its employees, to parties in interest in the Bankruptcy Case, and those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher and better bids for the Purchased Assets or as otherwise necessary in connection with the Bankruptcy Case.  Seller also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by law and shall be entitled to publish notice of the contemplated Transactions in appropriate publications.

7.4     Bankruptcy Issues.

(a)     Filing of Bid Procedures Motion.  As part of its first day pleadings, or no later than three (3) Business Days following the commencement of the Bankruptcy Case], Seller shall file with the Bankruptcy Court a motion (the "Bid Procedures Motion") seeking entry of an order approving bidding procedures substantially consistent with the provisions of Section 7.4 of this Agreement, which order, when entered, shall be substantially in the form of Exhibit C attached hereto (the "Bid Procedures Order") or as otherwise reasonably agreed on by the parties.

(b)     Bidding Procedures.  In the Bid Procedures Motion, Seller shall seek, among other things, approval of the following procedures (the "Bidding Procedures"), which shall be incorporated into the Bid Procedures Order:

(i)     Any third party (other than Purchaser or the Secured Lender) that is interested in being a participant in the Auction (as defined below) and acquiring all or substantially all of the Purchased Assets (each an "Overbidder"), must submit an "Initial Overbid" in conformance with this Section 7.4(b) prior to 3:00 p.m. Pacific time on July 24, 2008 (the "Bid Deadline").  Any such Initial Overbid must:

(A)  Contain a signed definitive asset purchase agreement in substantially the form of the Purchase Agreement (marked to show changes from the Purchase Agreement) with, at a minimum, the following requirements:  (v) designating the Assets or other assets of Debtor to be acquired and having similar terms and conditions as the Purchase Agreement; (w) provide for a purchase price with respect to the Assets in excess of the sum of (1) the Purchase Price, (2) the Breakup Fee (as defined below), and (3) $50,000.00 ((1)-(3), the "Initial Overbid Amount"); (x) provide that the purchaser thereunder will forfeit Termination Fee (defined below), as liquidated damages if such purchaser defaults under such purchase agreement; (y) not be subject to any (1)

financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the Overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the Overbidder's obligation to purchase the Assets other than those included in the Purchase Agreement; and (z) no Initial Overbid shall provide for the payment to the Overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement.

(B) Include a deposit (the "Sale Deposit") in the form of either a wire transfer to an account specified by Debtor or a certified check in the amount of ten percent (10%) of the proposed purchase price payable to the order of Debtor and such deposit shall be held in escrow in a segregated account of Debtor pending the closing of the asset sale, which amount shall be forfeited as liquidated damages if such Qualified Bidder is the Final Purchaser (defined below) and fails to close the transaction because of a breach or failure to perform on the part of the Final Purchaser (the "Termination Fee");

(C) To the extent not previously provided to Debtor, include an executed confidentiality agreement (in form and substance reasonably satisfactory to Debtor);

(D) To the extent not previously provided to Debtor, be accompanied by evidence satisfactory to Debtor in its commercially reasonable discretion that the Overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under its purchase agreement in the event that it submits the Prevailing Bid (as hereinafter defined) at the Auction (as defined below); and

(E) Be submitted to counsel for the Debtor so as to be received not later than the Bid Deadline. Counsel shall, as soon as practicable, send a copy of the Initial Overbid to the following parties: Sterling Savings Bank, counsel to Sterling Savings Bank, counsel to the Committee, if any, Purchaser and Purchaser's counsel.

      (ii)    Auction. In the event that Debtor determines, in its reasonable discretion, that it has received a qualifying Initial Overbid from a prospective purchaser (a "Qualified Bidder"), then Debtor will conduct an auction on July 28, 2008 (the "Auction") with respect to the sale of the assets at the offices of Sussman, Shank LLP, 1000 SW Broadway, Suite 1400, Portland, OR 97205 or at such other location as may be designated by Debtor. Purchaser shall be deemed to be a Qualified Bidder, but shall not otherwise be required to comply with the requirements of Paragraph 1(A) above. Debtor will provide no less than 48 hours' notice to Purchaser and all Qualified Bidders that the Auction will be held. No Qualified Bidder may propose to purchase different groups of assets on varying contract terms except bids for substantially all of the

Assets. All bids must be for cash or cash equivalents. After consultation with counsel for Sterling Savings Bank and the Committee, Debtor shall determine the highest and best bid. The "Final Purchaser" shall be the party (including Purchaser) that submits the highest and best bid at the Auction. No bids may be received after the announced conclusion of the Auction. At the Auction, Qualified Bidders and Purchaser may submit successive bids in increments of at least $25,000.00 greater than the prior bid (the "Incremental Bid Amount") for the purchase of all or substantially all of the Assets until there is only one bid that Debtor determines, in its sole discretion, and subject to Bankruptcy Court approval, is the highest and best bid (the "Prevailing Bid"), *provided*, Purchaser shall be entitled to include as part of any subsequent bid a credit for the amount of the Breakup Fee (defined below). If no conforming Initial Overbid shall have been received at or prior to the Bid Deadline, no Auction will be held and the Bankruptcy Court hearing held in the Bankruptcy Case to approve the highest and best bid for the Assets (the "Sale Approval Hearing") will proceed with respect to the Purchase Agreement. In the event that the Final Purchaser (other than Purchaser) defaults or fails to close the proposed transactions, then the party who, in the determination of Debtor, submitted the prior high bid for the Assets shall be deemed to be the Final Purchaser, and the purchase price shall be the amount of such prior high bid. Notwithstanding the foregoing, Debtor may impose such other terms and conditions as it may determine to be in the best interest of Debtor's estate, its creditors and other parties in interest; provided such terms and conditions shall not be inconsistent with the terms of the Purchase Agreement unless otherwise agreed to by Purchaser.

(iii)     Breakup Fee. If Debtor accepts an offer from a Final Purchaser (other than Purchaser), then: (a) Debtor shall pay to Purchaser at the closing of such sale (the "Closing") solely from the sale proceeds in cash or other immediately available funds an amount equal to (i) $100,000 in cash plus (ii) the reasonable actual out of pocket expenses incurred by Purchaser and approved by the Court (including any costs and expenses incurred in seeking Court approval of the reasonableness of the fees); provided that the sum of (i) and (ii) shall not exceed five percent (5%) of the Purchase Price as calculated at Closing under the Purchase Agreement (the "Breakup Fee"); or (b) if a Final Purchaser (other than Purchaser) does not consummate its purchase and forfeits the Termination Fee, Debtor shall pay Purchaser the Breakup Fee solely from such Sale Deposit. If Debtor terminates the Purchase Agreement in a manner not excused under the Purchase Agreement, Purchaser shall be entitled to the Breakup Fee. In any case, however, the Breakup Fee shall not be due and payable if Purchaser has

committed a material breach of the Purchase Agreement prior to the consummation of such sale to the third party. The parties agree that the Breakup Fee shall be the full and liquidated damages of Purchaser arising out of any wrongful termination of the Purchase Agreement by Debtor. This shall survive any termination of the Purchase Agreement. The Breakup Fee shall constitute a super-priority administrative claim in the Chapter 11 Case pursuant to Bankruptcy Code Sections 503(b) and 507(a).

(iv)     <u>Bankruptcy Court Approval of Sale</u>.     Debtor and the Final Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an order (the "<u>Sale Approval Order</u>"), which is reasonably acceptable to the Final Purchaser (and if Final Purchaser is Purchaser, in the form required under the Purchase Agreement), of the Bankruptcy Court in the Bankruptcy Case (i) approving the applicable purchase agreement, (ii) authorizing the sale of the Assets pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, interests and encumbrances, (iii) relieving Final Purchaser of any claim of successor liability, and (iv) authorizing the assumption and/or assignment of the executory contracts pursuant to section 365 of the Bankruptcy Code, provided, however, Debtor shall be entitled to take such actions as may be required in connection with the discharge of its fiduciary duties in the bankruptcy case (including soliciting higher or better offers for the Assets). In connection with the assumption and/or assignment of the executory contracts pursuant to section 365 of the Bankruptcy Code, the Final Purchaser shall take all reasonable actions required to provide "adequate assurance of future performance" by the Final Purchaser after the closing of such sale. Debtor and the Final Purchaser shall consult with one another regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect, the Bankruptcy Court's entry of the Sale Approval Order approving the Final Purchaser. Purchaser shall not be obligated to consult with Debtor regarding any pleadings if Purchaser is not the Final Purchaser. If for any reason the Final Purchaser is unable or unwilling to consummate an approved sale because of breach or failure to perform on the part of the Final Purchaser, (a) it will forfeit its Termination Fee to Debtor as liquidated damages in lieu of any other damages with respect to such breach, and (b) the Qualified Bidder making the next highest or otherwise best bid shall be deemed to be the Final Purchaser, the purchase price shall be the amount of such Qualified Bidder's last bid, and Debtor shall be authorized to effectuate the sale without further order of the Bankruptcy Court. If, for any reason, any subsequent Final

Purchaser fails to perform, Purchaser agrees that if Debtor tenders full performance of all of its obligations under the Purchase Agreement to Purchaser on or before August 5, 2008, and the Purchase Agreement is not otherwise materially breached by Debtor, Purchaser shall purchase the Assets under the terms of the Purchase Agreement and shall become the "Final Purchaser" for purposes of Section B hereof.

## 8.    Tax Matters.

8.1    Tax Cooperation.   Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Seller and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

8.2    Allocation of Taxes.    The Parties acknowledge and agree that the Transactions are being consummated in contemplation of a plan of reorganization to be confirmed in the Bankruptcy Case. As a result, as contemplated by section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document to evidence, effectuate or perfect the rights, transfers and interests contemplated by this Agreement, shall be free and clear of any and all transfer taxes, stamp taxes or similar taxes.  Purchaser and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  Seller shall be responsible for any sales, use, transfer stamp or similar Taxes imposed on the transfer of the Purchased Assets to the extent Taxes are not preempted by section 1146(a) of the Bankruptcy Code.

8.3    Property Taxes.  All Property Taxes for a Tax period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Seller, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period").  Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. The Apportioned Obligations of Seller shall be estimated based on property valuation and levy rates from the preceding Tax period (unless the valuation and levy rates for the current Tax period exist) and agreed to in good faith by the Parties as of the Closing Date.  Seller will be responsible for payment of Seller's pro rata share of the estimated obligations, and Purchaser shall bear the responsibility of paying Purchaser's pro rata share. If the Apportioned Obligations are higher than anticipated, Seller and Purchaser shall be responsible for their pro rata share.

## 9.    Employee Matters.

9.1    Employees and Offers of Employment. As of the Closing Date, Purchaser shall offer employment to the Retained Employees of Seller. The terms of such employment offers will be as determined by Purchaser in its sole and absolute discretion; provided, that such employment offer will be on substantially the same terms and conditions under which such Employee is currently employed, including job responsibility and compensation. Retained Employees shall become eligible for employee benefits in accordance with Purchaser's employee benefit plans. Notwithstanding that Purchaser agrees to comply with the terms of this Section, any Retained Employees hired will be hired on an at-will basis. Subject to Purchaser's obligations under Section 10.2, Purchaser shall have no obligation after the Closing to continue to retain these employees if in Purchaser's sole judgment the Retained Employees are not suitable for Purchaser's operation of the Business. Nothing in this Section 9.1 shall, however, create any rights in favor of any person not a party hereto, including Employees of the Business or any Retained Employees, or constitute an employment agreement or condition of employment for any Employee of Seller or any Retained Employee, or require Purchaser to sponsor, maintain or contribute to any particular employee benefit plan, program or arrangement or to provide any particular benefit to Retained Employees. Nor shall anything herein prevent Purchaser from changing the terms and conditions of employment, including, without limitation, job responsibility and compensation with respect to any Retained Employee at any time after the Closing Date.

9.2    Employee Plans.

(a)    The Parties recognize that the continued employment of the Retained Employees is significant to the business interests of both Purchaser and Seller. As such, the orderly transfer of employment relationships is important to the Parties and Purchaser will use commercially reasonable efforts to accomplish the transition with as little disruption to the businesses of Seller as possible.

(b)    Purchaser shall maintain employee records transferred to Purchaser hereunder with respect to Retained Employees for a period of not less than four (4) years from the Closing Date and during that period will afford Seller reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records.

## 10.    Closing Conditions.

10.1    Conditions to Obligations of Purchaser and Seller. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    The Bankruptcy Court shall have entered the Bid Procedures Order in a form and substance reasonably acceptable to Purchaser no later than July 3, 2008, and such order shall be in full force and effect and shall not have been stayed, violated or reversed.

(b)    The Bankruptcy Court shall have entered the Sale Approval Order no later than July 30, 2008, in the Bankruptcy Case, authorizing the Transactions and approving this Agreement and the ancillary agreements contemplated hereby under sections 105(a), 363 and 365 of the Bankruptcy Code, and as of the Closing Date the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated or reversed. The Sale Approval Order shall be in form and substance reasonably acceptable to Seller and Purchaser and shall:

(i)    provide that Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code;

(ii)    waive any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(g) or 6006(d);

(iii)    provide that the sale of the Purchased Assets shall be free and clear of all Liens and Claims, other than Permitted Liens and Assumed Liabilities;

(iv)    provide that the Transactions are approved and that Seller's execution, delivery and performance of the documents related to the Transactions are approved; and

(v)    provide that, except contemplated by <u>Section 2.5</u> of the Agreement, Seller is authorized to assume and assign the Assumed Contracts and Intellectual Property Rights pursuant to section 365 of the Bankruptcy Code, notwithstanding any provisions that restrict the assignability thereof.

(c)    No injunction, stay or similar order or decree, issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

10.2    <u>Conditions to Obligations of Purchaser.</u> The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date.

(b)    the representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date).

(c)    Seller shall have provided Purchaser with a certificate of an appropriate officer of Seller that there shall have been not Material Adverse Effect relating to the Business or Seller.

10.3    <u>Conditions to Obligations of Seller</u>.    The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)    (i) Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, and (ii) the representations and warranties of Purchaser contained in this Agreement be true and correct in all respects at and as of the Closing Date with the same effect as though made at and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representations and warranties shall be true and correct in all respects on the date so specified).

(b)    Seller shall have received all documents it may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Seller.

**11.**    **Survival**.    The Parties hereto agree that all representations and warranties contained in this Agreement or in any certificate or other writing delivered by Seller or Purchaser in connection herewith or covenants and agreements contained in this Agreement or in any certificate or other writing delivered by Seller or Purchaser in connection herewith that by their terms are to be performed before Closing, shall terminate upon Closing, and neither Seller nor Purchaser shall have any liability to the other for any alleged breach of such warranties and representations or pre-Closing covenants or agreements if the Closing occurs. The covenants and agreements contained in this Agreement or in any certificate or other writing delivered by Seller or Purchaser in connection herewith that by their terms are to be performed after Closing, shall terminate upon lapse of the applicable statute of limitations. Notwithstanding the foregoing, if any representation or warranty is later determined to be false and made by either Party with knowledge of such falsity, the aggrieved Party shall retain all rights and remedies that it would have under applicable law for such breach. The parties hereto agree that the covenants and agreements contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

**12.**    **Termination**.

12.1    <u>Grounds for Termination</u>.    This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Purchaser, if any condition set forth in <u>Sections 10.1</u> and <u>10.2</u> has not been satisfied by July 31, 2008 and such condition is incapable of being satisfied;

(c)    by Purchaser, if Seller has breached its obligation under this Agreement, provided that if such breach is capable of being cured, Purchaser shall have given Seller ten (10) days to cure such breach;

(d)    by Seller, if any condition set forth in <u>Sections 10.1</u> and <u>10.3</u> has not been satisfied by July 31, 2008, and such condition is incapable of being satisfied;

(e)    by Seller, if Purchaser has breached its obligation under this Agreement, provided that if such breach is capable of being cured, Seller shall have given Purchaser ten (10) days to cure such breach;

(f)    by Purchaser, if (i) the Bankruptcy Case is converted into a Chapter 7 proceeding, (ii) Seller files a plan of reorganization that excludes, prohibits or does not provide for the consummation of the Transactions with Purchaser, or (iii) if the Bankruptcy Case is dismissed;

(g)    by Purchaser, if some Person other than Purchaser is the Final Purchaser and the sale of substantially all the Purchased Assets to such Final Purchaser is closed;

(h)    by Seller, if (i) Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets pursuant to the terms of the Bid Procedures Order, and (ii) the Bankruptcy Court enters an order in the Bankruptcy Case approving such definitive agreement;

(i)    by Seller, if Sterling terminates its ability to use cash collateral under the Cash Collateral Order; or

(j)    by Purchaser, at any time prior to the hearing to approve bid procedures, which shall be no earlier than June 30, 2008, and bid protections for Purchaser, if Purchaser determines in its sole discretion that it does not want to proceed with the transaction as a result of Purchaser's due diligence investigation.

The Party desiring to terminate this Agreement pursuant to this <u>Section 12.1</u> (other than pursuant to <u>Section 12.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 13.1</u>.

12.2    <u>Effect of Termination</u>.    If this Agreement is terminated as permitted by <u>Section 12.1</u>, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in <u>Sections 2.8</u> and <u>7.4(b)</u>.  The provisions of <u>Sections 2.8</u>, <u>12.2</u>, <u>12.3</u>, <u>13.1</u>, <u>13.4</u>, <u>13.5</u>, <u>13.6</u>, and <u>13.10</u> shall survive any termination hereof pursuant to <u>Section 12.1</u>.

12.3    <u>Expenses</u>.    Except for the payment of the Breakup Fee pursuant to Section 7.4, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

**13.    Miscellaneous**.

13.1    <u>Notices</u>.    All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

> SC Design, Inc.
> 70 Broadway, Suite 1100
> San Diego, CA 92101
> Attn: Steve M. Santa Cruz
> Fax: (619) 232-7101

*with a copy to*:

> Perkins Coie LLP
> 1120 NW Couch St., 10th Floor
> Portland, OR 97209
> Attention: Douglas Pahl
> Fax: 503-727-2222

if to Seller, to:

> Trinity Carpet Brokers, Inc.
> Attn: John H. Chism
> 2690 SE Mailwell Drive
> Milwaukie, OR 97222

*with copies to*:

> Sussman Shank LLP
> 1000 Broadway, Suite 1400
> Portland, OR 97205
> Attn: Barry Caplan
> Fax: (503) 248-0130

> -and (with regard to notices prior to Closing)-

> Sterling Savings Bank
> c/o Greene Markley
> 1515 SW Fifth Avenue, Suite 600
> Portland, OR 97201
> Attn: David Foraker
> Fax: (503) 224-8434

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

13.2   Waivers. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise

thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

13.3    <u>Successors and Assigns</u>.    The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party.    Notwithstanding the foregoing, Purchaser may assign all or any portion of its rights and obligations hereunder to one or more of its subsidiaries or affiliates simultaneously with the Closing.

13.4    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Oregon and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of law that would provide for application of another law.

13.5    <u>Jurisdiction</u>.

(a)    Prior to the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 13.1</u> shall be deemed effective service of process on such Party.

(b)    Upon the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Oregon, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party

anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

13.6   Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

13.7   Third Party Beneficiaries. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.

13.8   Time is of the Essence. Due to the manufacturing requirements of Seller and Purchaser, time is of the essence with respect to the Closing of the Transactions. Seller and Purchaser will use their commercially reasonable efforts to proceed to sale as expeditiously as possible, subject to the notice requirements of the Bankruptcy Code and the time demands of the Bankruptcy Court.

13.9   Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

13.10   Entire Agreement; Amendments; Counterparts.    This Agreement (including the Schedules and Exhibits hereto) set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

**[Signature page to follow]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLER:**

TRINITY CARPET & FLOORING

By: _____
Name: John Chism
Title: CEO


**PURCHASER:**

SC DESIGN, INC. or its assignee

By: _____
Name: Steve M. Santa Cruz
Title: Chief Executive Officer

**Exhibit A**

**Escrow Agreement**

# ESCROW AGREEMENT

This ESCROW AGREEMENT (this "Agreement"), dated as of June __, 2008, is between and among SC Design, Inc. ("Purchaser"), Trinity Carpet Brokers, Inc. ("Seller"), and Chicago Title Insurance Company of Oregon (the "Escrow Agent").

## RECITALS

**A.**    Under a separate Asset Purchase Agreement dated June 20, 2008, between the Purchaser and Seller (the "Asset Purchase Agreement"), Purchaser agreed to purchase the assets and assume certain liabilities of Seller on terms and conditions described therein. The Asset Purchase Agreement is set to close on July 31, 2008.

**B.**    As part of the consideration for the Asset Purchase Agreement, Purchaser has agreed to deposit a non-refundable deposit of $100,000 ("Non-Refundable Deposit") into an escrow account managed by the Escrow Agent, No. 50-457434-CL, pursuant to the terms herein. The Non-Refundable Deposit will be deposited, maintained and used under the terms set forth herein, which are consistent with the terms of the Asset Purchase Agreement.

**C.**    On June 20, 2008 ("Petition Date"), Seller filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court, for the District of Oregon, Case No. _08-3507_ (the "Bankruptcy Case").

**D.**    Upon filing the filing of the Bankruptcy Case, Seller may also be known as Trinity Carpet Brokers, Inc., Debtor in Possession.

## AGREEMENT

The parties agree that the Recitals are hereby incorporated into the terms of this Agreement, and further agree as follows:

## SECTION 1. Delivery of Non-Refundable Deposit

On the later of one (1) Business Day after (i) execution of the Asset Purchase Agreement by Purchaser and Seller or (ii) the Petition Date, Purchaser will wire transfer the Non-Refundable Deposit by immediately available funds to the account designated by the Escrow Agent.

## SECTION 2. Purpose of Non-Refundable Deposit

The purpose of the Non-Refundable Deposit is for use by Seller to pay administrative expenses incurred in the Bankruptcy Case, including the payment of employee wages, the payment of fees owed to the Office of the United States Trustee, professional fees owed to any counsel for Seller

EX____*A*

PAGE__*1*__ OF *9*

and any other professionals appointed for Seller in the Bankruptcy Case, and professional fees for counsel representing a class of creditors that may become assembled in the Bankruptcy Case (collectively "Administrative Expenses"). Administrative Expense shall not include fees or other amounts due and owing to Sterling Bank.

## SECTION 3. Authorized Disbursement of Non-Refundable Deposit

Upon receipt of a copy of an order of the bankruptcy court administrating the Bankruptcy Case authorizing payment of any specified Administrative Expense, and identifying the recipient and the approved amount thereof, the Escrow Agent is authorized to disburse a payment from the Non-Refundable Deposit in the amount(s) and to the recipient(s) identified in the bankruptcy court's order. The copy of the bankruptcy court's order need not come from the bankruptcy court, itself. The copy of the bankruptcy court's order need not reference the Non-Refundable Deposit or any other source for the payment of the Administrative Expenses. In the event that all eligible Administrative Expenses arising out of the Bankruptcy Case have been paid, and there is a remaining balance of the Non-Refundable Deposit, the remaining balance of the Non-Refundable Deposit shall be paid to Seller upon the closing of the Asset Purchase Agreement, upon written instructions from Purchaser, Seller, or their agents. In the event the Bankruptcy Case is dismissed or converted and all eligible Administrative Expenses arising out of the Bankruptcy Case have been paid, the remaining balance of the Non-Refundable Deposit shall be refunded to Purchaser, upon written instructions from Purchaser, Seller or their agents.

## SECTION 4. Procedure for Disbursements to Seller

Upon the Escrow Agent's confirmation of authority to disburse payment for Administrative Expenses, as set forth in Section 3, above, the Escrow Agent will disburse the payment as ordered by the Bankruptcy Court. Upon confirmation of wire, the Escrow Agent will send notice of such disbursement, including the date of transmission and amount of money, to Purchaser and Seller by sending such notice to the addresses designated herein for Purchaser and Seller.

## SECTION 5. Term of Escrow

This Agreement will commence on delivery of the Non-Refundable Deposit to the Escrow Agent. This Agreement will terminate on the earlier of the following events: (1) final distribution of the Non-Refundable Deposit by the Escrow Agent pursuant to this Agreement; (2) confirmation that the Bankruptcy Case is dismissed or converted and all eligible Administrative Expenses arising out of the Bankruptcy Case have been paid, and the Escrow Agent has returned the remaining balance of the Non-Refundable Deposit to Purchaser; (3) confirmation that all eligible Administrative Expenses arising out of the Bankruptcy Case have been paid, and the Escrow Agent has paid the remaining balance of the Non-Refundable Deposit to Seller upon the closing of the Asset Purchase Agreement; or (4) the Escrow Agent's receipt of written instructions signed by Purchaser and Seller regarding the agreed upon disposition of the remaining balance of the Non-Refundable Deposit and the Escrow Agent's performance pursuant to such instructions.

/ / /

EX _A_

PAGE _2_ OF _9_

## SECTION 6.  The Escrow Agent's Limited Duties

In consideration of the Escrow Agent's acceptance of this Escrow Agreement, Purchaser and Seller agree as follows:

(a)    The Escrow Agent's obligations and duties in connection with this Agreement are confined to those specifically enumerated in this Agreement;

(b)    The Escrow Agent will not be liable or responsible in any manner for the sufficiency, correctness, genuineness, or validity of any instruments deposited with the Escrow Agent, or with reference to the form of execution of the instruments or the identity, authority, or rights of any person executing or depositing the instruments;

(c)    The Escrow Agent is under no obligation to ascertain the terms or conditions of any instruments or to comply in any respect with the terms of the instruments; and

(d)    The Escrow Agent will not be liable for any loss that may occur by reason of forgeries or false representations by others, resulting from the exercise of the Escrow Agent's discretion, or for any other reason, except for the Escrow Agent's gross negligence or willful misconduct.

## SECTION 7.  Fees of the Escrow Agent

Purchaser and Seller will each pay one-half of the fees of the Escrow Agent. The basic schedule of fees of the Escrow Agent is set forth on Exhibit A to this Agreement as compensation for the Escrow Agent's ordinary services as contemplated by this Agreement. If the conditions of this Agreement are not promptly fulfilled, or if the Escrow Agent renders any requested service not provided for in this Agreement, or if there is any assignment of interest in the subject matter of this Agreement or any modification of the Pledge Agreement, or if any controversy arises under the Escrow Agreement, or if the Escrow Agent is made a party to or intervenes in any litigation pertaining to this Agreement or its subject matter, the Escrow Agent will be reasonably compensated for the extraordinary services and reimbursed for all costs and expenses caused by the event.

## SECTION 8.  Miscellaneous Provisions

**8.1.    Binding Effect.** This Agreement will be binding on and inure to the benefit of the parties and their respective heirs, personal representatives, successors, and assigns.

**8.2.    Assignment.** Neither this Agreement nor any of the rights, interests, or obligations under this Agreement may be assigned by any party without the prior written consent of the other parties.

**8.3.    No Third-Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended or will be construed to confer on any person, other than the parties to this Agreement, any right, remedy, or claim under or with respect to this Agreement.

**8.4.    Notices.** All notices and other communications under this Agreement must be in writing and will be deemed to have been given if delivered personally, sent by facsimile (with confirmation), mailed by certified mail, or delivered by an overnight delivery service (with

EX ___ A

PAGE 3 OF 9

confirmation) to the parties at the following addresses or facsimile numbers (or at such other address or facsimile number as a party may designate by like notice to the other parties):
///
///

If to Purchaser:

>Douglas R. Pahl
>Perkins Coie
>1120 NW Couch Street
>Tenth Floor
>Portland, OR 97209-4128
>Ph.:    503-727-2000
>Fax.:   503-727-2222

If to Seller:

>Barry P. Caplan
>Sussman Shank LLP
>1000 SW Broadway, Suite 1400
>Portland, OR 97205-3089
>Ph.:    503-227-1111
>Fax:    503-248-0130

If to the Escrow Agent:

>Cathy Lovely
>Chicago Title Insurance Co.
>888 SW 5th Avenue, Ste. 930
>Portland, OR 97204
>Ph.:  503-973-7400
>Fax: 503-248-0324

Any notice or other communication will be deemed to be given (a) on the date of personal delivery, (b) at the expiration of the 3rd day after the date of deposit in the United States mail, or (c) on the date of confirmed delivery by facsimile or overnight delivery service.

**8.5.    Amendments.** This Agreement may be amended only by an instrument in writing executed by all the parties.

**8.6.    Construction.** The captions used in this Agreement are provided for convenience only and will not affect the meaning or interpretation of any provision of this Agreement. All references in this Agreement to "Section" or "Sections" without additional identification refer to the Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Whenever the words *include* or *including* are used in this Agreement, they will be deemed to be followed by the words *without limitation.*

**Page 4 of 7 - ESCROW AGREEMENT**

EX____A
PAGE____4____OF____9

**8.7.    Counterparts.** This Agreement may be executed in counterparts, each of which will be considered an original and all of which together will constitute one and the same agreement.

**8.8.    Facsimile Signatures.** Facsimile transmission of any signed original document, and retransmission of any signed facsimile transmission, will be the same as delivery of an original. At the request of any party, the parties will confirm facsimile transmitted signatures by signing an original document.

**8.9.    Further Assurances.** Each party agrees (a) to execute and deliver such other documents and (b) to do and perform such other acts and things, as any other party may reasonably request, to carry out the intent and accomplish the purposes of this Agreement.

**8.10.    Time of Essence.** Time is of the essence with respect to all dates and time periods set forth or referred to in this Agreement.

**8.11.    Expenses.** Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear the party's own expenses in connection with the preparation, execution, and performance of this Agreement and the transactions contemplated by this Agreement.

**8.12.    Waiver.** Any provision or condition of this Agreement may be waived at any time, in writing, by the party entitled to the benefit of such provision or condition. Waiver of any breach of any provision will not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

**8.13.    Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the state of Oregon, without regard to conflict-of-laws principles.

**8.14.    Attorney Fees.** If any arbitration, suit, or action is instituted to interpret or enforce the provisions of this Agreement, to rescind this Agreement, or otherwise with respect to the subject matter of this Agreement, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court, and if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

**8.15.    Injunctive and Other Equitable Relief.** The parties agree that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that the other parties will be entitled, in addition to damages, to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

**8.16.    Venue.** During the pendency of the Bankruptcy Case, the United States Bankruptcy Court for the District of Oregon shall be the sole venue for any action or proceeding

EX _A_

PAGE _5_ OF _9_

seeking to enforce any provision of, or based on any right arising out of, this Agreement, unless otherwise ordered by the bankruptcy court administering the Bankruptcy Case. Otherwise, any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement will be brought against any of the parties in Multnomah County Circuit Court of the State of Oregon or, subject to applicable jurisdictional requirements, in the United States District Court for the District of Oregon, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to such venue.

**8.17.** **Exhibit.** The exhibit referenced in this Agreement is part of this Agreement as if fully set forth in this Agreement.

**8.18.** **Severability.** If any provision of this Agreement is invalid or unenforceable in any respect for any reason, the validity and enforceability of such provision in any other respect and of the remaining provisions of this Agreement will not be in any way impaired.

**8.19.** **Entire Agreement.** This Agreement (including the documents and instruments referred to in this Agreement) constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter.

The parties enter into this Agreement as of the date first written above.

PURCHASER

_____
Steve Santa Cruz, President
SC Design, Inc.

SELLER

_____
John Chism, CEO
Trinity Carpet Brokers, Inc.

ESCROW AGENT

_____
Chicago Title Insurance Company of Oregon
Escrow Agent

seeking to enforce any provision of, or based on any right arising out of, this Agreement, unless otherwise ordered by the bankruptcy court administering the Bankruptcy Case. Otherwise, any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement will be brought against any of the parties in Multnomah County Circuit Court of the State of Oregon or, subject to applicable jurisdictional requirements, in the United States District Court for the District of Oregon, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to such venue.

8.17.    **Exhibit.** The exhibit referenced in this Agreement is part of this Agreement as if fully set forth in this Agreement.

8.18.    **Severability.** If any provision of this Agreement is invalid or unenforceable in any respect for any reason, the validity and enforceability of such provision in any other respect and of the remaining provisions of this Agreement will not be in any way impaired.

8.19.    **Entire Agreement.** This Agreement (including the documents and instruments referred to in this Agreement) constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter.

The parties enter into this Agreement as of the date first written above.

PURCHASER

Steve Santa Cruz, President
SC Design, Inc.

SELLER

John Chism, CEO
Trinity Carpet Brokers, Inc.

ESCROW AGENT

_____
Chicago Title Insurance Company of Oregon
Escrow Agent

Page 6 of 7 – ESCROW AGREEMENT

EX___A___
PAGE___7___OF___9___

seeking to enforce any provision of, or based on any right arising out of, this Agreement, unless otherwise ordered by the bankruptcy court administering the Bankruptcy Case. Otherwise, any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement will be brought against any of the parties in Multnomah County Circuit Court of the State of Oregon or, subject to applicable jurisdictional requirements, in the United States District Court for the District of Oregon, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to such venue.

**8.17. Exhibit.** The exhibit referenced in this Agreement is part of this Agreement as if fully set forth in this Agreement.

**8.18. Severability.** If any provision of this Agreement is invalid or unenforceable in any respect for any reason, the validity and enforceability of such provision in any other respect and of the remaining provisions of this Agreement will not be in any way impaired.

**8.19. Entire Agreement.** This Agreement (including the documents and instruments referred to in this Agreement) constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter.

The parties enter into this Agreement as of the date first written above.

PURCHASER

_____
Steve Santa Cruz, President
SC Design, Inc.

SELLER

_____
John Chism, CEO
Trinity Carpet Brokers, Inc.

ESCROW AGENT

_____
Chicago Title Insurance Company of Oregon
Escrow Agent

EX A
PAGE 8 OF 9

F:\CLIENTS\19838\002\ESCROW AGREEMENT.DOC

## EXHIBIT A
## FEE SCHEDULE

Escrow Fee                    $350
Disbursements- each           $25

EX _____ A _____
PAGE 9 OF 9

**Exhibit B**

**Form of Assignment and Assumption Agreement**

**Exhibit C**

**Form of Bid Procedures Order**